IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HERIBERTO RODRIGUEZ ACOSTA,<br><br>Defendant. | CR-22-97-GF-BMM<br><br>**ORDER** |

**INTRODUCTION**

Defendant Heriberto Rodriguez Acosta ("Acosta") filed a motion to suppress (Doc. 51) and a motion to dismiss (Doc. 53) on March 29, 2024. The government opposes Acosta's motions. (Doc. 62); (Doc. 76.) The Court conducted a motion hearing on May 29, 2024, in Great Falls, Montana. (Doc. 79.)

**FACTUAL BACKGROUND**

The facts remain the same as the Court's previous order. (*See* Doc. 37.) FBI Task Force Officer ("TFO") James Balkman ("Balkman") received information on February 14, 2022, from a known confidential informant. (Doc. 30 at 3.) The informant reported that Hugo Rodriguez ("Rodriguez"), who is Acosta's cousin, was planning to bring fentanyl laced pills and methamphetamine from Yakima,

Washington to the Rocky Boy's Indian Reservation ("RBIR") within the next couple of days. *Id.* TFO Balkman confirmed a text exchange between Rodriguez and the informant that confirmed this information. *Id.* at 3–4.

TFO Balkman relayed information about the vehicle that Rodriguez would be driving to Border Patrol Intelligence Officer Asa Koontz. *Id.* at 4. Idaho's automatic license plate reader system sent out an alert on February 17, 2022, that the vehicle was in Idaho. *Id.* The alert provided the plate number and vehicle description with the comment "DRUG LOAD / DEVELOP OWN PC." (Doc. 28-2.) ISP Master Corporal Holly Branch ("Corporal Branch") observed the vehicle and followed it. (Doc. 30 at 4–5.)

The vehicle entered a turn lane without signaling near the intersection of Lakewood Drive and Northwest Boulevard. (Doc. 28 at 6.) Corporal Branch initiated a traffic stop at 4:16 p.m. and requested that a canine respond. (Doc. 30 at 5.) Corporal Branch testified that the occupants appeared nervous and fidgety upon contact. Law enforcement ran Rodriguez's and Acosta's identifications. Rodriguez's information returned at approximately 4:23 p.m. (Doc. 28-2 at 2.) Acosta's information returned at approximately 4:29 p.m. (*Id.*)

Kootenai County Probation Officer ("PO") Mark Severance ("Severance") responded at 4:25 p.m. and deployed his canine at 4:29 p.m. (Doc. 28-3; Doc. 28-2 at 2.). The canine alerted to the hood of the vehicle. The ISP officers then requested

to pat search Rodriguez. Rodriguez admitted that he had methamphetamine and pills on his person. Law enforcement recovered these substances and arrested Rodriguez.

At approximately 4:33 p.m. Acosta was handcuffed and read his *Miranda* rights by Idaho State Police Sergeant Scotch ("Sgt. Scotch"). (Doc. 52 at 2.) Sgt. Scotch told Acosta he was not under arrest. (*Id*.) Sgt. Scotch handcuffed Acosta based on concerns of Acosta fleeing. (Doc. 67 at 2-3.) Acosta claims that he was high on fentanyl at the time that he was handcuffed. (Doc. 52 at 3.) Acosta was subsequently placed in the back of a patrol car. (Doc. 67 at 3.) Acosta told Sgt. Scotch that he felt like he was going to throw up. (Doc. 52 at 3.) The ISP officers allowed Acosta to sit with the car door open so he could get some fresh air. (*Id.*) The ISP officers then began a hand search and requested that PO Severance redeploy the canine. (Doc. 28-3.) The canine again alerted to the hood and to an area underneath the radio on the driver's side. *Id.* ISP officers located a box containing 300 fentanyl pills, or approximately 149.72 grams.

Acosta made voluntary statements while sitting alone in the police car. (Doc. 67 at 3.) Law enforcement officers transported subsequently Acosta to the Idaho State Police facility and interviewed him. (*Id.* at 4.) At approximately 6:00 p.m. Acosta was questioned by Detective William Adams and Border Patrol Agent Koontz. (Doc. 52 at 3-4.) Officers asked Acosta if he felt sick or if he was sick from withdrawals. (Doc. 67 at 4.) Acosta indicated he was okay. (*Id*.) The ISP officers did

not readvise Acosta of his *Miranda* rights, and the officers asked him incriminating questions. (Doc. 52 at 4.) A written waiver of *Miranda* rights was not presented to Acosta at any time. (*Id.*) At 6:28 p.m. Acosta signed a written consent form to search his phone and provided law enforcement with the passcode to access his phone. (Doc. 67 at 4.)

## LEGAL BACKGROUND

The Court denied previously Acosta's motion to suppress. (Doc. 37.)

## LEGAL STANDARD

*Miranda* warnings are required when a suspect is in custody and being interrogated. *United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). "To determine whether an individual was in custody, the court must . . . decide whether there was a formal arrest or restraint on freedom of movement of the degree associated of a formal arrest." *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)). Interrogation occurs when the questions are likely to elicit a criminating response from the suspect. *United States v. Mata-Abundiz*, 717 F.2d 1277, 1279 (9th Cir. 1983) (citing *Innis*, 446 U.S. at 301). It is undisputed in this case that Acosta was in custody and being interrogated and, therefore, *Miranda* warnings were required.

"Waivers of *Miranda* rights do not need to be explicit; a suspect may impliedly waive the rights by answering an officer's questions after receiving *Miranda* warnings." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (quoting *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998)). A waiver is valid when it is voluntarily, knowingly, and intelligently given. *Rodriguez-Preciado*, 399 F.3d at 1127. Courts have declined to create a bright-line rule as to when a suspect must be readvised of their rights after a passage of time. *Id.* at 1128 (citing *United States v. Andaverde*, 64 F.3d 1305, 1312 (9th Cir. 1995)). The Ninth Circuit has upheld the admissibility of statements, for example, made fifteen hours after *Miranda* warnings and two days after *Miranda* warnings. *Id.* at 1128.

When determining if a statement was voluntary, the test is "whether . . . the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Costa*, 214 F. Supp. 3d 935, 942 (D. Mont. 2016) (quoting *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998)). A defendant's state of mind is not dispositive in rendering a statement involuntary. *Costa*, 214 F. Supp. 3d at 942. "Instead, 'coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.''" *Id.* (quoting *Colorado v. Connelly*, 479 U.S. 157, 165–66 (1986)).

The Ninth Circuit has identified five factors to determine if consent to a search was voluntarily given: "(1) whether defendant was in custody; (2) whether the

arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that [they] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (internal quotation marks omitted). "It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was 'purged of the primary taint.'" *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) (quoting *Wong Sung v. United States*, 371 U.S. 471, 488 (1963)).

## DISCUSSION

The Court will consider first Acosta's motion to suppress (Doc. 52.) The Court will then examine Acosta's motion to dismiss (Doc. 54.)

### I.    Acosta's motion to suppress.

#### A. Whether Acosta's statements were given in violation of *Miranda*.

Acosta claims that law enforcement failed to re-advise him of his *Miranda* rights when he was interviewed at the Idaho State Police facility. (Doc. 52 at 4.) Acosta's position proves unavailing because law enforcement was not required to re-*Mirandize* him, and Acosta previously received valid *Miranda* warnings. It

6

remains undisputed that Acosta received valid *Miranda* warnings from Sgt. Scotch at approximately 4:33 PM. (Doc. 52 at 2; Doc. 67 at 3.)

The Ninth Circuit's determination in *Rodriguez-Preciado,* 399 F.3d at 1127, proves instructive. Officers questioned the defendant in *Rodriguez-Preciado* sixteen hours after having been advised of his *Miranda* rights. *Id*. at 1129. The Ninth Circuit concluded that the defendant had validly waived his *Miranda* rights by responding to officers' questions after receiving the required warning. *Id.* at 1128. The Ninth Circuit concluded that law enforcement was not required to advise the defendant of their *Miranda* rights a second time because no break in questioning occurred. *Id*. The Ninth Circuit further recognized that *Rodriguez-Preciado's* rights and circumstances had not materially changed. *Id*.

Acosta verbally responded to officers after being read his *Miranda* rights and continued to do so through the interrogation at the Idaho State Police facility. The time in between Acosta being *Mirandiz*ed and being questioned at the Idaho State Police facility proves shorter than the sixteen-hour break approved by the Ninth Circuit in *Rodriguez-Preciado*. 399 F.3d at 1127. Acosta was questioned less than two hours after having been advised of his *Miranda* rights. (Doc. 52 at 3; Doc. 67 at 4.) No evidence suggests that Acosta's rights or circumstances had materially changed between the initial *Miranda* warnings and the questioning at the Idaho State Police Facility. (Doc. 52 at 2, 4.)

Acosta relatedly argues that he was unable to implicitly waive his *Miranda* rights due to physical incapacitation caused in part by fentanyl withdrawal. (Doc. 52 at 3.) The facts presently before the Court fail to support Acosta's contention. Acosta appears, admittedly, to have been physically ill during the initial stop and while being placed in the back of a patrol car. (Doc. 67 at 3.) Law enforcement officers' uncontroverted testimony, coupled with video evidence of law enforcement's interview with Acosta, reveal that Acosta communicated clearly, responded to questioning, and was aware of his surrounding and the circumstances that led to his detention and subsequent interrogation.

The fact that Sgt. Scotch conceded that Acosta was mumbling and feeling sick at the scene of the initial detention does not disturb the conclusion that Acosta's statements were the products of his own rational choice and free will. Acosta made several voluntary statements while in the backseat of the police car, including a request to speak with officers. (Doc. 67 at 3.) Acosta talked freely with law enforcement officers when questioned at the Idaho State Police Facility, and his statements and demeanor demonstrate that he applied rational choice and free will when engaging in such discussion. (*Id.* at 4.) The evidence presented does not indicate that Acosta's will was overcome or that Acosta's statements were the product of improper physical or psychological coercion on the part of the government. *See Fischer*, 137 F.3d at 1165.

The facts presented prove similar to the facts analyzed by the Montana District Court in *Costa*. 214 F. Supp. 3d at 942-43. In *Costa*, despite the defendant's elevated blood alcohol content and mumbling, he was still able to communicate clearly with law enforcement. *Id.* The Montana District Court determined that the defendant's statements were admissible because the defendant spoke voluntarily with law enforcement. *Id*. The Montana District Court recognized that Costa may have been under the influence of alcohol, but determined that Costa acted intelligently, knowingly, and voluntarily, and, therefore, the defendant's statements were the products of their rational intellect and free will. *See id*. at 943 (citing *Shackleford v. Hubbard*, 234 F.3d 1072, 1080 (9th Cir. 2000)). Only if a defendant was coerced physically or psychologically will a defendant's statements be suppressed. *Costa*, 214 F. Supp at 941 (citing *United States v. Lewis*, 833 F.2d 1380, 1386-87 (9th Cir. 1987)).

### B. Whether the search of Acosta's phone should be suppressed as fruit of the poisonous tree.

"It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was purged of the primary taint." *Washington*, 490 F.3d at 774 (internal quotation omitted). Acosta has failed to demonstrate that his *Miranda* rights were violated. Officers asked Acosta for consent to search his phone at the Idaho

9

State Police facility. (Doc. 52 at 4.) Acosta agreed and signed a consent form. (*Id*.) The search of Acosta's phone and his text messages do not represent fruit of the poisonous tree and will not be suppressed.

## II. Acosta's motion to dismiss.

Acosta accuses the government of not having provided all *Brady/Giglio* information and engaging in sanctionable conduct regarding the government's confidential informant. (Doc. 54 at 6.) Acosta asks the Court to order all *Brady/Giglio* information be provided to him and prays that the Court determine that the government engaged in conduct warranting sanctions, up to and including dismissal of the indictment. (*Id*.)

### A. *Brady/Giglio* Information

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Three things must be true for a *Brady* violation to have occurred: "[T]he evidence at issue must be favorable to the accused . . . that evidence must have been suppressed by the [government], either willfully or inadvertently, and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Disclosure is required when it pertains to a witness's credibility. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). "Delay in disclosure only

requires reversal if it so prejudiced [defendant's] preparation or presentation of his defense that he was prevented from receiving a fair trial." *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988). A delayed disclosure can cure a due process violation if the disclosure happens at a time "of value to the accused." *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) (quoting *Gordon*, 844 F.2d at 1403).

Acosta asserts the government untimely disclosed *Brady/Giglio* information concerning a confidential informant. (Doc. 75 at 11.) The government provided over 1000 pages of discovery to defendant between March 7, 2024, and April 1, 2024. (*Id.*) U.S. Magistrate Judge John Johnston ordered the government to comply with its disclosure obligations under *Brady* and related cases on March 7, 2023. (Doc. 8.) Acosta has failed to prove a *Brady* violation using the elements outlined in *Strickler*, 527 U.S. at 281-82. It remains undisputed that the government eventually provided impeachment materials concerning the confidential informant, albeit late in the trial preparation process. (Doc. 75 at 11-12; Doc. 77 at 3-4.) Trial is currently scheduled for August 5, 2024. (Doc. 73.) Acosta has received *Brady/Giglio* materials at a time of value before trial, and he may use such materials to prepare and present a defense. Acosta's assertion that the government's delay in disclosure prejudiced him falls short.

### B. Sanctionable Conduct

11

"A district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation." *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991). "In order to show outrageous government conduct, defendants must show conduct that violates due process in such a way that is 'so grossly shocking and so outrageous as to violate the universal sense of justice.'" *United States v. Dominguez-Caicedo*, 40 F.4th 938, 948 (9th Cir. 2022) (quoting *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991)). The Court may dismiss the indictment under its supervisory powers if conduct does not rise to a due process violation. *Barrera-Moreno*, 951 F.2d at 1091. Three circumstances exist where a court's supervisory powers may be exercised: "to remedy a constitutional or statutory violation, to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury, or to deter future illegal conduct." *Id*. "A court may dismiss an indictment under its supervisory powers only when the defendant suffers 'substantial prejudice' and where no lesser remedial action is available." *United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008) (internal citations omitted).

The Ninth Circuit's analysis in *United States v. Hugs*, 109 F.3d 1437, 1379 (9th Cir. 1997), proves instructive. The defendants in *Hugs* argued their indictments should have been dismissed because of illegal conduct by an undercover agent. *Id.* at 1379. The undercover agent in *Hugs* admitted to having acted unlawfully by

killing out of season game and bringing alcohol onto the reservation. *Id*. The defendants were prosecuted for violating the Bald and Golden Eagle Protection Act (BGEPA). *Id*. at 1377. The Ninth Circuit determined that the undercover agent's conduct fell short of outrageousness. *Id*. at 1379. The Ninth Circuit further recognized that the defendants were involved in violating the BGEPA before to the undercover activity. *Id*.

The alleged bad conduct by a confidential informant does not rise to the level of a due process violation requiring dismissal. The confidential informant here was known to traffic drugs before becoming an informant for the government. (Doc. 54 at 2.) The confidential informant's conduct of using drugs and providing tips to the government falls short of the outrageous conduct standard because the government did not engineer and direct the confidential informant's activities. Acosta was already allegedly involved in criminal activity before the confidential informant's tip that led to his arrest, similar to the defendants in *Hugs*. 109 F.3d at 1379. The confidential informant's alleged actions, though not mandating dismissal, nevertheless may go to their credibility should the government choose to present them at trial. Acosta will have the opportunity at trial to impeach the confidential informant's credibility based on the information disclosed by the government.

Accordingly, **IT IS ORDERED**

1. Acosta's motion to suppress (Doc. 51) is **DENIED.**

2. Acosta's motion to dismiss (Doc. 53) is **DENIED.**

DATED this 20th day of June 2024.

_____
Brian Morris, Chief District Judge
United States District Court